UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF WISCONSIN

TAMARA H. POTKAY,

        Plaintiff,

        v.                              Case No.  14-C-0181

DAVID AMENT,
CITY OF NEW BERLIN,

        Defendants.

## DECISION AND ORDER GRANTING IN PART AND DENYING IN PART MOTION FOR TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION (DOC. 4)

This case brings to mind the old adage:  "If it looks like a duck and quacks like a duck, it's probably a duck."  Here, the defendants argue that Mayor David Ament's termination of Tamara Potkay's employment as Director of Human Resources for the City of New Berlin was a permissible layoff pursuant to a "mini reduction in force" (a "mini-RIF"), but the termination looks and sounds like a firing in violation of civil service rules—so much so that the court will grant Potkay's motion for temporary restraining order and preliminary injunction.

Potkay sues the City of New Berlin and its mayor, David Ament, regarding Ament's termination of Potkay's employment on January 24, 2014.  Potkay brings the lawsuit pursuant to 42 U.S.C. § 1983, alleging a deprivation of property without due process.  She seeks a temporary restraining order and preliminary injunction reinstating her as the City's Director of Human Resources.  Pursuant to an agreement of the parties at court hearings, the City has been paying Potkay's salary and providing her with health benefits while the

motion has been pending.  However, Potkay wishes to return to work and to stop defendants from reorganizing her position out of existence.

## FINDINGS OF FACT

For purposes of Potkay's motion the court finds the following based on the verified complaint,[1] defendants' answer, Potkay's affidavit, Ament's affidavit, Ronald Pezze's affidavit, Potkay's testimony at a court hearing, and the agreements of the parties.

In 1990 Potkay was hired by the City as a human resources employee.  (Compl. ¶ 7; Answer ¶ 7.)  She was promoted and appointed Director of Human Resources ("HR Director") by Mayor James Gatzke in 1997, with confirmation by the City's Common Council.  (Compl. ¶ 7; Potkay Aff. ¶ 3.)  Potkay remained Director of Human Resources until January 24, 2014.  (Potkay Aff. ¶ 3.)

In 2010, as part of the budget process, the City's Common Council directed the mayor to cut $1,000,000 from the budget before it would pass it.  (Mar. 13 Hr'g Tr. at 7-8, 24.)  Thereafter, the mayor and key department heads set up a layoff plan.  (*Id.* at 8.) Potkay was given input regarding the layoffs.  (*Id.* at 9.)

On October 27, 2010, then-Mayor Jack Chiovatero sent a memo to the City Council regarding his plan of cost-saving measures "[b]ased on economic conditions and the Council's desire."  (Ament Aff. Ex. B at 1.)  Chiovatero stated that under the plan the City's workforce would shrink, and attached a list of twelve positions affected and a "New Gov" plan setting forth several cost-saving initiatives.  (Ament Aff. Ex. B at 1-2.)  As a result, between eleven and fourteen employees, including two in civil service positions, identified

---

[1]Potkay verified the Complaint via paragraph 20 of her affidavit.

in § 11-5 of the City's municipal code, were laid off. (Ament Aff. ¶ 4; Mar. 13 Hr'g Tr. at 4-5.) On November 2, 2010, Potkay sent an email to the chair of the City's Civil Service Commission making him "aware that we laid off 2 civil service employees last week." (Ament Aff. Ex. C; Mar. 13 Hr'g Tr. at 21-22.) "We" meant Potkay, the department head, and the mayor. (Mar. 13 Hr'g Tr. at 22.)

The Civil Service Commission had not taken action on and was not consulted about the layoffs prior to the layoffs occurring. (Mar. 13 Hr'g Tr. at 22-23.) Minutes from the Civil Service Commission's November 30, 2010, meeting indicate a report to the committee that two civil service employees were laid off on October 25, 2010, and a discussion that Chapter 11 of the municipal code did not need to be modified under the circumstances. (Ament Aff. Ex. D.)

The budget that ultimately passed for 2010 to 2011 included those layoffs. (Mar. 13 Hr'g Tr. at 8, 34.) By adopting the budget, the Common Council ended the funding for the positions in the next budgetary period. (*Id.* at 34-35.) But prior to the layoffs the Common Council did not take any action other than to issue the general directive to make cuts in the budget. (*Id.* at 35.)

The civil service employees who were laid off were not terminated because of performance problems or as a form of discipline. (*Id.* at 32-33.) Those employees were available for recall for one year and their position titles remained in the City's civil service code. (*Id.* at 8-9, 36.)

Around the time of the 2010 layoffs, Chiovatero advised the Council that he was creating a new Department of Community Relations and combining that department, responsible for all public relations tasks, with the City Clerk's department. (Ament Aff. ¶ 5.)

3

The departments were reorganized and a new job description for the City Clerk combined the public relations duties with the clerk's position. (Ament Aff. ¶ 10, Ex. E.)

Telesfore Wysocki was mayor of the City from 2001 to 2005. (Potkay Aff. ¶ 7.) During his tenure as mayor, Wysocki attempted to suspend and discipline Potkay and to reduce her pay, but Potkay prevailed in contested legal proceedings following arbitration. (Compl. ¶ 9; Potkay Aff. ¶ 7.) Wysocki actively campaigned for Ament in the 2013 mayoral race. (Potkay Aff. ¶ 8.)

Ament was elected mayor of the City and took office in April 2013. (Compl. ¶ 9; Answer ¶ 9.) Ament had served as a City alderman starting April 2001. (Ament Aff. ¶ 1.) He says that as an elected official and taxpayer he is committed to providing needed services to the City's residents in the most cost-effective manner possible. (Ament Aff. ¶ 2.)

After he was elected mayor, Ament began reviewing the operations of City departments for opportunities to reduce costs while maintaining necessary services. (Ament Aff. ¶ 2.) He met with a Waukesha County supervisor and other County personnel to explore partnership opportunities, including the possibility of the County assuming oversight of the City's human resources functions, but the County staff indicated that the County was not in a position to take on anything additional. (Ament Aff. ¶ 8.) As a consequence, the option was not pursued further. (*Id.*) Ament considered whether the finance department could be combined with another department; however, he was told by the Cities and Villages Mutual Insurance Company that few municipalities had successfully consolidated finance operations with another department. (Ament Aff. ¶ 9.) Because of that information and the fact that the finance director rescinded his resignation, Ament

abandoned that option. (Ament Aff. ¶ 10.) Ament then explored the possibility of combining the human resources functions with the functions of the City Clerk.

Ament believed that the reduction in the number of employees represented by unions and reduction in the number of labor contracts as a result of the passage of Act 10 by the Wisconsin state government reduced the work of the HR Director. (Ament Aff. ¶ 11.) Further, he believed that the City Council's establishment of a negotiations committee with primary responsibility for negotiating labor contracts further reduced the HR Director's responsibilities. (Ament Aff. ¶ 11.) Additionally, the City had reduced the workforce through the 2010 layoffs and outsourced dispatch operations to the County in 2012, and had implemented a software program used to process applications for position vacancies. (Ament Aff. ¶ 11.) Therefore, Ament estimated that reorganization of the human resources department could save $119,000. (Ament Aff. ¶ 12.)

Ament looked at the qualifications of Potkay and Kari Morgan, the City Clerk, and determined that Morgan was better suited for a revised combined City Clerk/human resources position. (Ament Aff. ¶ 13.) According to Ament, Potkay had no experience as a City Clerk, whereas Morgan is a Wisconsin Certified Municipal Clerk with experience managing the human resources functions in a prior position. (Ament Aff. ¶ 13.) According to Potkay, Morgan's experience was in a very small community where she was the only full-time person in the town's office with three to six part-time employees. (Mar. 13 Hr'g Tr. at 10.) On the other hand, Potkay does not have and is not in the process of obtaining a Wisconsin Certified Municipal Clerk certificate. (Mar. 13 Hr'g Tr. at 29.) The City Clerk position requirements state that "WCMC, WCPC, IIMC certifications [are] preferred." (Ament Aff. Ex. E at 2.)

5

In late December 2013 or early January 2014 Ament drafted a description for the proposed combined position.  (Ament Aff. ¶ 15.)  He met with outside counsel, Attorney Mary Hubacher, on January 15, 2014, to obtain legal advice on moving forward with a reduction in force laying off the HR Director.  (Ament Aff. ¶¶ 16, 17.)  Hubacher advised that instead of creating a new position, which would require the approval of the Civil Service Commission, Ament should maintain the position of City Clerk and combine the human resources responsibilities with the City Clerk's functions, similar to what had occurred in 2010.  (Ament Aff. ¶ 19.)  Additionally, Hubacher advised that under his suggested approach Ament had authority as mayor to implement the reorganization without the prior approval of the City Council or Commission.  (Ament Aff. ¶ 20.)

According to Potkay, Act 10 had the opposite effect than what Ament believed.  Human resources professionals now perform daily personnel duties that previously were governed by collective bargaining agreements.  (Potkay Aff. ¶ 12.)  Act 10 increased Potkay's duties and responsibilities.  (Mar. 13 Hr'g Tr. at 14.)

After he took office as mayor, Ament interfered with Potkay's duties concerning collective bargaining and excluded her without notice from important meetings with department heads and managers.  He demanded that Potkay rewrite the City's forty-plus personnel policies, develop additional personnel policies, create an employee handbook, and develop new systems to implement the new policies and handbook provisions within ten weeks of his demand, which Potkay says was an impossible set of tasks within the time allotted.  (Potkay Aff. ¶ 9.[2])

---

[2]Ament's affidavit does not dispute these statements by Potkay.

When Potkay used medical leave, Ament asked that prior to returning to work she provide him with a medical opinion that she was able to fully perform her position. (Ament Aff. ¶ 32.) This is similar to requests Potkay had made as HR Director of other City employees. (*Id.*) However, according to Potkay, when she tried to use medical leave, Ament changed again and again the required content of her physician and related forms, impacting Potkay's relationship with her physician. (Potkay Aff. ¶ 10.)

Ronald Pezze was and is an appointed member of the New Berlin Police & Fire Commission ("PFC"). (Pezze Aff. ¶ 1.) While a member of the PFC, he was involved in the hiring of the police and fire chiefs. The PFC asked Potkay, as HR Director, to provide assistance during the hiring of the fire chief, and Pezze believed she provided valuable assistance. (*Id.* ¶ 2.) During 2011 and 2012 the PFC discussed revisions to its rules and regulations and included Potkay in the discussions, and Pezze believed she provided valuable assistance. (*Id.* ¶ 3.) The PFC's discussions addressed revising the hiring process, and adding the HR Director to certain aspects of the process, such as interviews. (*Id.* ¶ 4.)

After Ament was elected mayor he appointed Wysocki and another commissioner to the PFC. (Pezze Aff. ¶¶ 5, 6.) Subsequently, Wysocki was elected chair of the PFC. (*Id.*) Wysocki placed further revisions to the PFC's rules and regulations on the PFC's agenda. (*Id.* ¶ 7.) The PFC was scheduled to meet on January 23, 2014. (*See id.* ¶¶ 8, 11.) On January 22, 2014, Pezze received an email from Wysocki that was addressed to the PFC members, the police chief, and the fire chief setting forth twenty items regarding the rules and regulations. (*Id.* ¶ 8.) The email was not addressed to Potkay. (*Id.*) Pezze noted that the changes proposed by Wysocki in his January 22 email deleted all references

7

to the HR Director.  (*Id.* ¶ 10.)  At the January 23 PFC meeting Wysocki proposed that the various references to the HR Director be deleted.  When asked for his rationale, Wysocki replied "she was 'not independent.'"  (*Id.* ¶ 11.)

On January 24, 2014, Ament met with Potkay and informed her that "he had decided for business reasons 'to eliminate the position of Director of Human Resources effective immediately,' and that Ms. Potkay was thus 'being laid off from employment with the city effective today.'"  (Compl. ¶ 11; Answer ¶ 11; *see* Potkay Aff. ¶ 17; Ament Aff. ¶ 24.)  Ament gave various reasons why it was the "best business decision" he could make. (Potkay Aff. ¶ 16.)

Ament had outside legal counsel Hubacher at this meeting where he and outside counsel presented Potkay with a proposed severance agreement reflecting their assertion that "'the position of Director of Human Resources is being eliminated by the City.'" (Compl. ¶ 11; Answer ¶ 11; Ament Aff. ¶ 24.)  Hubacher told Potkay that in return for the benefits under the severance agreement Potkay would waive all claims against the City. (Ament Aff. ¶ 24.)   The proposed severance agreement provided for twenty weeks of severance pay, a contribution by the City to COBRA health insurance payments through August 2014, and an agreement by the City not to contest any claim for unemployment benefits.  The proposed severance agreement then included a provision stating that "there are no other amounts, obligations or additional benefits due Ms. Potkay by the City. Further, Ms. Potkay acknowledges and agrees that she is not eligible for any separation or termination benefit from the City other than as set forth herein."  (Ament Aff. Ex. J ¶ 5.) Potkay did not accept the severance agreement or counter the offer.  (Ament Aff. ¶ 24.)

8

According to Ament, he had "decided to move forward as soon as possible with the restructuring of operations with City Hall by laying off the Director of Human Resources under § 11-10 of the City's civil service code and combining responsibilities for human resources with the City Clerk's office. Ms. Potkay's separation from employment with the City was not a disciplinary termination under § 11-11 of the code." (Ament Aff. ¶ 14.)

Ament directed his assistant, Melody Styba, to email the City Council to advise them of the reorganization, and Styba did so on January 24, 2014. (Ament Aff. ¶ 25.) Styba also sent an email to all City employees advising them of the reorganization. (Ament Aff. ¶ 26.)

A few days earlier, Ament had advised Morgan of the reorganization so she would be ready to assume responsibility for human resources immediately on January 24, 2014. (Ament Aff. ¶ 22.) Ament avers that Morgan, Hubacher, and Styba "are the only City employees and representatives who knew about the implementation of the reorganization prior to the morning of [his] meeting with Ms. Potkay on January 24th." (Ament Aff. ¶ 23.) He says he "told no other City employees or representatives, including Ted Wysocki, about the reorganization prior to its implementation on January 24, 2014." (Ament Aff. ¶ 23.)

Potkay was not consulted with respect to the mayor's action to lay her off on January 24, 2014. (Mar. 13 Hr'g Tr. at 11.) Nor did the mayor bring to her attention that he was thinking of merging the finance director's position with another. (*Id.* at 17.) To Potkay's knowledge, consideration of the finance director position was not brought to the attention of the Civil Service Commission or Common Council. (*Id.*)

Morgan assumed responsibility for managing the human resources functions in the City as of January 24, 2014. According to Ament, since that date Morgan

9

has reviewed the personnel files of all City employees and is in the process of bringing them into compliance with state and federal law. Ms. Morgan has also undertaken completion of the review of outdated personnel policies that the Mayor had requested be completed by the end of December of 2013. In addition, Ms. Morgan has initiated the development of an employee handbook for City employees, which had not been developed despite the implementation of Act 10 in June 2011, and which the Mayor had also requested be completed. The employee handbook will replace the prior practice of providing new employees with a pack of General Administrative Policies ("GAPs"), many of which were outdated. In addition, inconsistencies in the application of policies to City employees and in one instance, the terms of a collective bargaining agreement to the benefit of one employee, have been corrected. Ms. Morgan has addressed other items including distribution of updated health insurance packets to employees, who had not been made aware of changes to some of their health insurance benefits. She has also updated pay charts and is in the process of updating organizational charts.

(Ament Aff. ¶ 27.) According to Ament, he has observed the transition of the human resources responsibilities to the City Clerk and is confident that they are being handled effectively. (Ament Aff. ¶ 28.)

Potkay is a single mother. Two of her four children live with her and the other two, though adult, have special needs. (Compl. ¶ 13; Potkay Aff. ¶ 13.) Potkay has a high-school diploma; she advanced in her employment with the City and was promoted to HR Director as a result of her performance and on-the-job experience. (Compl. ¶ 13; Potkay Aff. ¶ 13.) Potkay is forty-seven years old. (Potkay Aff. ¶ 15.) Due to an accident and other health concerns, she has eight prescriptions and approximately $500 per month of out-of-pocket medical expenses even with health coverage provided by the City. She cannot afford COBRA healthcare insurance premiums or costs. (Compl. ¶ 13; Potkay Aff. ¶ 14.) She maintains that termination of her employment by the City will require the sale of her home if she is unable to obtain comparable employment. (*See* Potkay Aff. ¶ 13.)

The position of HR Director is fully funded in the City's budget for the 2014 year. (Comp. ¶ 14; Potkay Aff. ¶ 18.) According to Potkay, the HR Director's duties are extensive and require daily attention. (Potkay Aff. ¶ 18.) On the other hand, Ament maintains that if Potkay returns to employment in "the former position" of HR Director,

> [h]er presence would interfere with the successful progress the organization has made since her departure. Employee offices have been moved to accommodate the reorganization. Some employees have been relocated, and some have had their hours changed, due to the reorganization. City employees are becoming accustomed to their new roles and responsibilities, and reentry of Ms. Potkay into the City's employ would disrupt this successful evolutionary process.

(Ament Aff. ¶ 29.) Further, City employees have been instructed not to talk with Potkay because of this litigation, and returning her to employment with the City would put those employees in a difficult position. (Ament Aff. ¶ 30.) Moreover, Potkay would have access to confidential information to further this lawsuit. (Ament Aff. ¶ 31.)

DISCUSSION

To obtain a temporary restraining order or preliminary injunction an applicant must establish (1) a reasonable likelihood of success on the merits, (2) no adequate remedy at law, and (3) irreparable harm to the plaintiff if injunctive relief is denied. *Planned Parenthood of Ind., Inc. v. Comm'r of Ind. State Dep't of Health*, 699 F.3d 962, 972 (7th Cir. 2012), *cert. denied*, 133 S. Ct. 2736 (2013). If those requirements are shown, the district court weighs the balance of harm to the parties if the injunction is granted or denied, including consideration of the public interest. *Id.* The strength of a plaintiff's likelihood of success on the merits affects the balance of harms: the more likely it is that the plaintiff will prevail, the less the balance of harms needs to weigh in her favor. *Id.*

A.      Likelihood of Success on the Merits

To succeed on a claim under 42 U.S.C. § 1983, Potkay must establish that (1) she was deprived of a right secured by the Constitution or laws of the United States, and (2) the defendants acted under color of state law. *Gomez v. Toledo*, 446 U.S. 635, 640 (1980); *Waubanascum v. Shawano County*, 416 F.3d 658, 665 (7th Cir. 2005). Here, the second element is met; defendants are the City and its mayor, and they do not dispute for purposes of this motion that they acted under color of state law.

Potkay contends that when the City ended her employment on January 24, 2014, it deprived her of property without due process. To recover on this procedural due process claim, Potkay must show that she had a protectable property interest in her employment. *See Gorman v. Robinson*, 977 F.2d 350, 356 (7th Cir. 1992). To hold a protectable property interest in a position, a plaintiff must have more than an "abstract need or desire for it" and more than a "unilateral expectation of it." *Cole v. Milw. Area Technical Coll. Dist.*, 634 F.3d 901, 904 (7th Cir. 2011) (quoting *Bd. of Regents of State Colls. v. Roth*, 408 U.S. 564, 577 (1972)). A plaintiff must have a "legitimate claim of entitlement to it." *Id.*

Such property interests are created and defined by an independent source, such as a contract or state law, or, as alleged here, municipal ordinance. *Gen. Auto Serv. Station v. City of Chicago*, 526 F.3d 991, 1000 (7th Cir. 2008); *Reed v. Village of Shorewood*, 704 F.2d 943, 948 (7th Cir. 1983); *see Roth*, 408 U.S. at 577. A constitutionally protected property interest arises when government gives its employees assurances of continued employment. *Gorman*, 977 F.2d at 356. A provision stating that employees may be terminated only for just cause is such an assurance of continued employment. *Id.* at 357.

Potkay points to the New Berlin Municipal Code (the "Code") as the source of her property interest. Chapter 11 of the Code governs "Civil Service." (Ament Aff. Ex. 1 at 1.) The Code lists the HR Director as a civil service position in the classified service with appointment authority. (*Id.* §§ 11-4, 11-5, 11-7.B.) As such, when Potkay was hired she was appointed by the mayor with confirmation by the Common Council. (*See id.* §§ 11-4.C(1), 11-7.B, 11-8.D.(4).) An appointment becomes "absolute" after the successful completion of a one-year period. (*Id.* § 11-9.) No person appointed to the classified service shall be removed from such service except in accordance with Chapter 11. (*Id.* § 11-4.C(2).) "Civil service employees hired under civil service procedures shall be removed or suspended under civil service procedures." (*Id.* § 11-13.A.)

Section 11-12 of the Code is titled "Procedures for suspension, demotion and dismissal." (*Id.* § 11-12.) When an appointing authority concludes after appropriate investigation that an employee in the classified service has demonstrated cause for suspension, demotion, or dismiss, the appointing authority and HR Director may suspend, demote, or dismiss the employee. (*Id.* § 11-12.A.) The employee must receive written notice of the action and the right to appeal the action to the Civil Service Commission. (*Id.*) Upon receipt of an appeal, the Commission must set a time and place for a hearing and after the hearing must determine whether the charge is well-founded. (*Id.*) The employee is entitled to be represented by counsel (at no expense to the City). (*Id.*) The Commission may direct the HR Director and appointing authority to take such action regarding suspension, demotion, discharge, or reinstatement as the Commission deems proper. (*Id.* § 11-12.B, .C.) The Commission's decision on the appeal is final and binding and subject to appeal only under state statutes governing arbitration. (*Id.* § 11-12.B, .C.)

13

Section 11-10 of the Code is titled "Layoffs" and reads: "When the City reduces personnel, employees shall be laid off based upon merit and qualifications as determined by the appointing authority with input from the Director of Human Resources." (*Id.* § 11-10.) The HR Director shall establish and maintain reinstatement lists containing the names of persons who were laid off under § 11-10. (*Id.* § 11-8.B.) Laid-off employees remain on the reinstatement list according to seniority within their classification for one year from the date of separation. (*Id.*) The HR Director may strike a name from the reinstatement list or refuse to certify a person for the list for a particular position if he or she finds that the person is not qualified to satisfactorily perform the required duties. (*Id.*) However, for any striking from or refusal to certify a person for the reinstatement list, the HR Director "shall notify the Civil Service Commission of the person whose name is so removed. Such person shall have the rights and privileges accorded to suspended, demoted, dismissed or discharged employees under §§ 11-12 and 11-23 of [the] chapter . . . ." (*Id.* § 11-8.B.)

Defendants seemingly concede that Potkay holds a property right in her position under the Code. They argue not that the civil service rules fail to protect her employment but that a particular provision of the Code allows this particular termination.

Defendants' concession is appropriate in light of the Code. The HR Director is listed as a position in the classified service, so Potkay could be removed from the position only in accord with the provisions of Chapter 11. Potkay's position became absolute after the one-year probationary period. And the only provision of Chapter 11 titled "Procedures for suspension, demotion and dismissal" requires cause for dismissal, written notice, and a hearing. (*See* Ament Aff. Ex. A § 11-12.) Under the Code, as a classified employee Potkay had an enforceable right to be dismissed only for cause (with applicable due

14

process) or by layoff. Potkay, as HR Director, was a tenured public employee with a legitimate claim to her position in the absence of cause for dismissal after appropriate notice and a hearing.

Defendants argue that Potkay's discharge, without any hearing, was permitted as a layoff under § 11-10 of the Code pursuant to a reorganization. Layoffs do not fall under the Code provision of § 11-12 requiring cause, written notice, and a hearing.

Under Wisconsin law, civil service laws are not an absolute job guarantee. *Castelaz v. City of Milwaukee*, 94 Wis. 2d 513, 521, 289 N.W.2d 259, 262 (1980), *overruled on other grounds*, *Casteel v. Vaade*, 167 Wis. 2d 1, 21 n.18, 481 N.W.2d 476, 484 n.18 (1992). Moreover, civil service laws are not intended to prevent good-faith reorganization. *State ex rel. Thein v. City of Milwaukee*, 229 Wis. 12, 281 N.W. 653, 656 (1938). Such laws "are not intended to interfere with a municipality combining the duties of one civil service position with those of another, even though this results in some persons being dropped from the service." *Id.* "If there are no funds available, or if the position is abolished in good faith or otherwise becomes unnecessary, there is nothing to prevent the termination of civil service employees." *Castelaz*, 94 Wis. 2d at 521; *accord Bahr v. State Inv. Bd.*, 186 Wis. 2d 379, 402, 521 N.W.2d 152, 160 (Ct. App. 1994). When such a governmental reorganization occurs, the protected employee may be terminated without notice or a hearing. *Campana v. City of Greenfield*, 164 F. Supp. 2d 1078, 1092 (E.D. Wis. 2001), *aff'd*, 38 Fed. App'x 339 (7th Cir. 2002).

But this exception applies only if the reorganization is legitimate. *Id.* "A municipality cannot 'cry "reorganization" in order to circumvent . . . constitutional and statutory protections.'" *Id.* at 1092-93 (quoting *Misek v. City of Chicago*, 783 F.2d 98, 101 (7th Cir.

15

1986)).  An employee can attack the legitimacy of the action in two ways, by showing (1) that no reorganization in fact occurred or (2) that a reorganization was done in bad faith. *Id.* at 1093; *see Misek*, 783 F.2d at 101 (stating that if the "reorganization" was a sham because the jobs were never abolished, the plaintiff may show that he was fired in an attempt to circumvent due process protections); *State ex rel. Thein*, 281 N.W. at 656 (stating that "civil service laws are not to be evaded by a sham abolition of an old position for the purpose of ousting an incumbent").[3]

Here, it is debatable whether a reorganization actually occurred.  The HR Director position still exists and has not been defunded by the Common Council.  This situation differs from the 2010 layoffs, when the Common Council defunded positions even though the positions remained in the Code as classified positions.  In this instance, the HR Director apparently has no more duties, all have been shifted to the City Clerk.  Ament prepared a revised job description for the City Clerk around the time he ended Potkay's employment. Whether this constituted a *Misek*-style of sham reorganization, where the job was never abolished, is disputable.  Hence, the court cannot find a likelihood of success for Potkay on this point.

---

[3]In certain instances, state law limits these challenges.  In *Campana*, Judge Adelman found that under Wisconsin law if a reorganization was carried out by a legislative body the court could not inquire into the motives of the legislative body.  164 F. Supp. 2d at 1093-94.  Thus, in that case he could inquire only into whether a reorganization actually occurred.  *Id.* at 1094; *see also Felde v. Town of Brookfield*, 570 F. Supp. 2d 1070, 1075 (E.D. Wis. 2008) (Adelman, J.) (citing *State ex rel. Miller v. Baxter*, 171 Wis. 193, 196, 176 N.W. 770 (1920)).  Because Potkay was terminated by Ament, not the Common Council, such a limitation for review of legislative action does not apply here.

In *Misek*, the Seventh Circuit recognized only a challenge based on a claim that the reorganization did not occur.  *See* 783 F.2d at 100-01.  However, as noted by Judge Adelman in *Campana* on this point, *Misek* interpreted and applied Illinois law, which did not permit challenges based on the bad faith of a municipality so long as the reorganization actually took place.  *See* 164 F. Supp. 2d at 1094 n.9.  This court agrees with Judge Adelman that civil servant property interests are not so limited by Wisconsin law.  In *State ex rel. Thein* the Supreme Court of Wisconsin recognized that bad-faith abolition of a job to remove an otherwise-protected employee can violate civil service laws.  *See* 281 N.W. at 655.

16

However, for several reasons, Potkay is likely to succeed at showing that what happened to her employment was a *Thein*-style bad-faith reorganization—a bad-faith abolition of the HR Director position in an attempt to remove Potkay from her job while evading her civil service rights.

First, although the defendants call Ament's action a RIF or layoff, it was an RIF of one, suggesting that it was a firing. It was not a layoff of eleven to fourteen City employees at the call of the Common Council to reduce the budget by $1,000,000. Instead, it involved just one employee and one position. A RIF of one (what defendants call a "mini-RIF") by itself suggests an impermissible motive.

The Seventh Circuit has discussed the mischaracterization of a termination as a RIF:

> A RIF takes place when an employer decides to eliminate certain positions from its workforce. RIFs typically involve the layoff of many employees at once, and employers will not be allowed cynically to avoid liability by terming a decision to fire an employee with a unique job description as a "RIF" when the decision in fact was nothing more than a decision to fire that particular employee.
>     . . . . The prototypical RIF involves a company that perhaps once employed 100 engineers, but because of a business slow down or change in product lines, now needs only twenty engineers. The rest of the positions are eliminated, not absorbed.

*Bellaver v. Quanex Corp.*, 200 F.3d 485, 494 (7th Cir. 2000). *Bellaver* involved a claim of sex discrimination rather than a due process claim, but the court recognized that treating Bellaver's termination as a RIF was not appropriate because she was the only employee terminated. The court found that an "inference of discrimination arises in single-discharge cases, sometimes called 'mini-RIFs,' where the terminated employee's duties are absorbed by other employees not in the protected class." 200 F.3d at 495. See also *Campana*, 164 F. Supp. 2d at 1095 (noting that the city council's decision not to fund the plaintiff's position

targeted only one employee, which "makes the decision look less like a legitimate reorganization and more like a summary dismissal"). Here, Potkay was the only person let go, and it was not because her duties were no longer needed by the City. Instead, the duties were absorbed by Morgan. The facts look like the elimination of the person rather than the elimination of the position.

Second, that Ament acted alone as mayor without a Common Council directive suggests that this was a firing rather than a layoff. No one disputes that the Cit's layoffs in 2010 occurred because the Common Council demanded that $1,000,000 be shaved from the budget. Regardless of whether the Common Council specifically approved of the layoffs before rather than after they were implemented, it implicitly approved such a budget-cutting measure. The mayor instigated the layoffs because of the known, joint needs or demands of the executive and legislative branches of the City. And § 11-10 states that when "the City" reduces personnel, employees shall be laid off based upon merit and qualifications as determined by the appointing authority with input from the Director of Human Services."

Though the appointing authority determines merits and qualifications (with input from the HR Director), the Code references personnel reductions by "the City." There is no question that the "appointing authority" in this case was the mayor. But the Code's reference to "the City" is ambiguous. Potkay argues that § 11-10 requires joint action by the Common Council and mayor, while defendants contend that the section's reference to the appointing authority vests the mayor with sole authority to layoff employees. Historical practice sheds little light on the Code provision. The 2010 layoffs can be considered action by the City—mayor and legislature combined—or action by the mayor with post-event

approval by the Common Council. But either way, contemporaneous joint activity regarding budget reductions and personnel reductions was taking place openly, supporting the legitimacy of the reorganization.

Here, no joint activity existed. The mayor acted alone, a move that is in line with a firing. (*See* Ament Aff. Ex. A § 11-12 (stating that suspension, demotion, or dismissal occurs by instigation of the appointing authority and HR Director).) Moreover, he acted behind the scenes rather than openly with the Common Council. At the termination hearing, Ament told Potkay of the elimination of the HR Director position (not merely a shifting of job duties), yet did not seek amendment of the Code by the Council to eliminate the position before or after the hearing. Nor does there appear to be evidence of prior studies or comments from City employees or the Common Council suggesting a reorganization as Ament and the City describe. The court need not determine at this time whether § 11-10 vested authority for layoffs in the mayor alone or in the mayor together with the Common Council, because even if the former is true, *how* Ament went about the process with regard to Potkay suggests a firing, not a layoff.

Defendants argue that they have been prevented from going forward with eliminating the HR Director position with Common Council's approval because of their stipulation pending the outcome of the pending motion. The court commends the parties for the stipulation to give the court time to issue this decision, and the court acknowledges that after February 20 the stipulation may have impeded proceedings before the Common Council on City personnel matters. But almost a month elapsed between Potkay's termination and the filing of this case on February 19, 2014, and there is no evidence in this

record indicating that Ament sought approval, implicit or explicit, from the Common Council or anyone else respecting a reorganization that eliminated the HR Director's position.

Third, Ament's termination of Potkay's employment was not part of a broader plan. As stated above, the 2010 layoffs occurred as one part of a larger, $1,000,000 cost-savings initiative. Here, it appears that the reorganization of the HR Director position was the only piece of reorganization occurring—again, suggesting a firing rather than a good-faith reorganization.

Fourth, Potkay has shown undue focus and hostility by Ament toward her. After his election Ament demanded tasks of Potkay in a compressed time frame and interfered with her work. He excluded her from important meetings with department heads and managers; he altered the medical documentation she needed in support of her leave; and he looked at three potential money-saving measures, and two involved eliminating Potkay's position. Such focus, demands and interference amplify the suspicious nature of a RIF of one.

Fifth, statements in Ament's affidavit support a finding that he dismissed Potkay because he was dissatisfied with her performance. Ament highlights how well Morgan is performing, suggesting that Potkay's performance was not satisfactory. His statement that Morgan "has reviewed the personnel files of all City employees and is in the process of bringing them into compliance with state and federal law" implies that Potkay had kept files that did not comply with law. His statements that "Morgan has also undertaken completion of the review of outdated personnel policies that the Mayor had requested be completed by the end of December of 2013" and "has initiated the development of an employee handbook for City employees . . . which the Mayor had also requested be completed" implies that Potkay disobeyed his directives for such work. He implies that Potkay allowed

20

policies to remain outdated and inconsistently applied and had not made employees aware of changes to some of their health insurance benefits. (*See* Ament Aff. ¶ 27.)

If Ament was dissatisfied with Potkay's work, then §§ 11-11 and 11-12 of the Code applied. And, if Ament was dissatisfied and then created a layoff of one suggests that he was sidestepping Potkay's due process rights.

Sixth, serious questions exist regarding Ament's credibility. Neither party called Ament as a witness, so the court can assess only his affidavit rather than his demeanor while testifying. And on paper serious questions arise. Ament swears in his affidavit that he told no one about the reorganization other than Styba, Morgan, and Hubacher. Yet two days before he reorganized the duties of the HR Director position to fall under the City Clerk and terminated Potkay, Ament's supporter, Wysocki, whom Ament appointed to the PFC, proposed deleting all references to the HR Director in the PFC rules. The timing of the proposed deletion makes it hard to believe that Wysocki knew nothing in advance about the elimination of Potkay's position. The dates on which the two men eliminated the HR Director's role are too close to view these events as mere coincidence.

Seventh, if this was a true layoff, the mayor should have consulted with Potkay, as the HR Director, even if the layoff was about her position. Section 11-10 of the Code does not authorize the mayor to act alone. It states that when "the City" reduces personnel, "employees shall be laid off based upon merit and qualifications as determined by the appointing authority with input from the Director of Human Resources." (*Id.* § 11-10.) Even if this provision is interpreted to allow the mayor to act without some involvement of the Common Council, the provision *requires* input from the HR Director. The Code provides no alternative if the HR Director is unavailable or the layoff is of the HR Director.

Defendants say that consultation with Potkay would have been absurd, that Potkay would have had an emotional response, and that giving her advance notice "would have been fraught with folly and potential for disharmony in the city." (Doc. 21 at 72.) Their prediction of an emotional response is purely speculative; Potkay is an experienced human relations professional. Perhaps she would have objected vehemently to her own layoff, but Ament might have proceeded forward anyway—he had to receive input, not approval, from the HR Director.

Further, even if consultation with Potkay would have been difficult and the Code is ambiguous about whom to consult when the HR Director is considered for layoff. Ament could have consulted someone else within the City. Instead, he consulted with Hubacher, even though the Code does not provide authority for an outside consultant to replace the HR Director.

That Ament did not seek advance input from Potkay or anyone else within the City suggests that he had ulterior motives. If he believed reorganization of some position or department, whether finance or human relations, was in the best interest of the City, the HR Director could have been consulted in the open. In *Campana*, for instance, the city council and city administrators had suggested consolidation of certain departments for four years, Campana had even suggested the consolidation, and the city had conducted studies and considered several possible structures. 164 F. Supp. 2d at 1094. Here, Ament says he considered three options—two of them involved eliminating Potkay's position—without any apparent involvement of the Common Council or the HR Director or anyone else within the City.

Eighth, Ament's presentation of a severance agreement at the January 24th meeting with Potkay suggests a termination in violation of her rights rather than a layoff. It appears there was no discussion at the January 24th meeting of Potkay being placed on a reinstatement roll in accordance with § 11-8. Instead, Ament or Hubacher discussed with Potkay a severance agreement pursuant to which Potkay would waive various rights. The proposed severance agreement provided for twenty weeks of severance pay, a contribution by the City to COBRA health insurance payments through August 2014, an agreement by the City not to contest any claim for unemployment benefits, and a statement that other than those particular benefits, no other obligations or additional benefits were due Potkay. (Ament Aff. Ex. J ¶ 5.) Presumably, reinstatement rights would fall under other "obligations or additional benefits" or other separation benefits not mentioned by the proposed agreement and thus would have been waived had Potkay signed the proposal.

The HR Director shall establish and maintain reinstatement lists containing the names of persons who are laid off under § 11-10. (Ament Aff. Ex. A § 11-8.B.) Laid-off employees remain on the reinstatement list for one year from the date of separation. (*Id.*) The HR Director may strike a name from the reinstatement list or refuse to certify a person for the list for a particular position if the person is not qualified to satisfactorily perform the required duties but must provide notice of that action and the laid-off employee has the rights accorded to suspended, demoted, dismissed or discharged employees under §§ 11-12. (*Id.* § 11-8.B.) Instead of discussing any of these recall rights with Potkay, Ament proposed severance.

The evidence and arguments are fuzzy regarding whether Potkay has been placed on or left off the reinstatement roll. Presumably a true layoff based on a reorganization

would have created a clearer reinstatement picture.  Though the parties did not submit evidence regarding the recall list, the court asked defense counsel about recall rights from the 2010 layoffs and how they compared to the present case.  In response, counsel stated at one point that "could [Potkay] come back or be brought back if for some reason there is an opening?  Of course."  (Mar. 26 Hr'g Tr. at 70.)  But he also discussed recall of Potkay only in the remote instance of Morgan vacating her position and that he could not say anything with certainty regarding that scenario because he was "not the mayor."  (Mar. 26 Hr'g Tr. at 69.)  However, it appears recall is not at the whim of the mayor.  It is based on a recall list maintained by the HR Director.  And the Code by its terms does not restrict the positions to which someone might be appointed on recall.  Further, if someone is not placed on or is taken off the reinstatement list, he or she must receive notice and the procedures under § 11-12.  A true layoff could have triggered discussion of or inclusion of recall rights in the proposed severance agreement.  The absence of any mention of Potkay's retention of such rights suggests that this was not a layoff.

For all of these reasons, the court finds it highly likely that Potkay will establish that the reorganization causing her termination was done in bad faith.  Regardless, defendants argue that Ament has qualified immunity and that Potkay has not asserted a *Monell* claim against the City.  Even so, she *has* asserted a *Monell* claim.  She alleges that Ament acted as a final policymaker, and she sues him in his individual and official capacities, the latter being the equivalent of a claim against the City.  (*See* Compl. ¶ 6.)  Therefore, the court does not need to decide qualified immunity at this time.  Although cities are "persons" for purposes of section 1983, liability against them may not arise vicariously; cities cannot be held liable under § 1983 on a respondeat superior basis.  *See Monell v. Dep't of Soc.*

24

*Servs.*, 436 U.S. 658, 691-92 (1978).  For a municipality to be liable, the plaintiff must establish that the municipality acted pursuant to its custom, policy, or practice.  *Monell*, 436 U.S. at 691; *Palka v. City of Chicago*, 662 F.3d 428, 434 (7th Cir. 2011).  To establish an official custom, policy, or practice, the plaintiff must show that her injury was caused by (1) enforcement of an express policy of the municipality; (2) a widespread practice so permanent and well settled to constitute a custom or usage with the force of law; or (3) a person with final policymaking authority.  *Palka*, 662 F.3d at 434.  The defendants' argument is that Ament, acting alone as mayor, could lay off Potkay and reorganize duties and departments.  As Ament had final decision making authority according to defendants, the City may have *Monell* liability.

B.     Adequacy of Remedy at Law

To prevail on her motion for entry of preliminary injunction, Potkay must show that she has no adequate remedy at law.  Defendants maintain that even if they are likely liable, any harm to Potkay can be remedied by a cash award.  However, while cash may address Potkay's lost income, it will not remedy the loss of her health benefits in the meantime.  Moreover, Potkay will lose the remedy—due process—to which the Fourteenth Amendment entitles her.  As Judge Barbara Crabb wrote in a case about a tenured employee's reinstatement through a preliminary injunction related to a due process violation,

> without preliminary relief, plaintiff will be terminated immediately from permanent employment without the procedural protections mandated by the due process clause of the Fourteenth Amendment to the Constitution of the United States.  Under these circumstances, it appears that plaintiff will lose his right to due process of law, and that such a loss cannot be adequately compensated.  That is, even if the plaintiff can prevail ultimately in this case, he still will have lost his constitutional right to a pretermination hearing, and there is no adequate means of restoring that right once the loss is suffered.

*Jessen v. Village of Lyndon Station*, 519 F. Supp. 1183, 1189 (W.D. Wis. 1981).

For these reasons, the court finds that Potkay's remedy at law is inadequate.

C.     Irreparable Harm and Balancing of Harms

To prevail on her motion for preliminary injunction, Potkay must show that if the injunction does not issue she will suffer irreparable harm.  The impact of denial of the injunction on Potkay and her family will be substantial during the pendency of this case, even if she prevails in the end.  She is a single mother with two children at home, and she may lose that home without her job.  Moreover, Potkay will not be able to afford COBRA premiums and will have substantial prescription and medical expenses.  Her employment prospects while this case progresses are uncertain.  Further, as stated above, Potkay's loss of her due process rights to notice and a hearing before termination cannot be restored absent a preliminary injunction.

The City, on the other hand, has funded Potkay's position through the end of 2014 and is better able to absorb the monetary impact of her employment than she is able to cope with the monetary impact of unemployment.  The HR Director position remains in the Code, with funding.

Defendants submit City employees will have a difficult time if Potkay returns to work because they have been instructed not to talk with her.  But that is a problem of the defendants' own making.  Moreover, somehow the City and Potkay worked through a comparable situation during Wysocki's tenure as mayor.  Additionally, the City presumably dealt with Potkay's access to confidential information and technology systems at that time.

Defendants contend that Potkay's duties have been shifted to Morgan and that employees' offices and hours have changed.  Also, they say her presence will upset the

"successful evolutionary process" in the wake of the reorganization. (*See* Ament Aff. ¶ 29.) Again, these problems are of the defendants' own making—and could have been prevented if Potkay had been provided due process prior to the actions at issue. Further, while the court is returning Potkay to her position as HR Director, the court will not direct what duties (if any) must be performed by the HR Director as this case proceeds. And it is unclear how the employees' schedules and offices will be impacted by Potkay's return.

Regarding the public's interest, while the City, and thus its residents, will experience the costs of Potkay's salary and benefits upon her return to work, they will receive her labor in return. Further, although the residents of the City have an interest in the actions of their elected mayor, they also have an interest in seeing that the City's Code is followed and that the City's employees are protected as provided in the Code passed by their elected leaders.

Potkay's likelihood of success is strong and the balance of harms tilts in her favor. Therefore, a preliminary injunction is warranted.

## SCOPE OF THE PRELIMINARY INJUNCTION AND BOND

Potkay is to be returned to her position as HR Director. She should be restored to her job because it appears the defendants' January 2014 attempt at reorganization was an end-run around her rights to notice and hearing. However, the court is not issuing a bar regarding procedures under § 11-12 of the Code so long as Potkay receives the process to which she is due. The court is mindful that it does not sit as a "superpersonnel department" and does not judge the wisdom of an employer's actions. *See Appelbaum v. Milwaukee Metro. Sewerage Dist.*, 340 F.3d 573, 579 (7th Cir. 2003). Further, Potkay's request for a bar against all attempts to eliminate her position goes beyond her Fourteenth

27

Amendment claim that is before this court. As discussed in caselaw, legitimate reorganization is permitted. In other words, at this stage the court has no basis for blocking future good-faith reorganization by the City.

The court may issue a preliminary injunction only if the movant provides security "in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained." Fed. R. Civ. P. 65©. The purpose of security is to compensate the enjoined party, if it eventually prevails on the merits or appeal, for the pecuniary harm caused by the preliminary injunction. *Builder's World, Inc. v. Marvin Lumber & Cedar, Inc.*, 482 F. Supp. 2d 1065, 1078 (E.D. Wis. 2007). Because damages caused by an erroneous preliminary injunction cannot exceed the amount of the security and because an error in setting the bond too high is not serious, district courts should err on the high side when setting bond. *Mead Johnson & Co. v. Abbott Labs.*, 201 F.3d 883, 888 (7th Cir.), *amended on other grounds*, 209 F.3d 1032 (2000); *Builder's World, Inc.*, 482 F. Supp. 2d at 1078.

At the end of the preliminary injunction hearing, counsel for defendants asked that a bond be set in the amount of the balance of Potkay's salary and benefits for this year. Subsequent to the hearing, Potkay filed a statement suggesting a $500 bond. As noted by Potkay in her submission, although the City will pay her salary and benefits while the preliminary injunction is in place, she will be exchanging her work for those expenditures. Thus, contends Potkay, those sums will not be pecuniary losses for the City.

The court agrees that Potkay's labor is an exchange for her salary and benefits and that those costs will not constitute pecuniary losses. For possible losses to the City

regarding adjustment of other employees' offices or hours or other reasons related to replacing Potkay on the employment roll, the court will set the bond at $1,000.

CONCLUSION

Because the court concludes that Potkay has established a reasonable likelihood of success on the merits of her claim, that remedies at law are inadequate, and that the balancing of harms tilts in her favor,

IT IS ORDERED that Potkay's motion for temporary restraining order and preliminary injunction (Doc. 4) is granted as set forth above regarding return to her position but denied as to prevention of future reorganization or discipline.

IT IS FURTHER ORDERED that bond for the preliminary injunction is set at $1,000. Potkay shall file proof of the bond within seven days following the entry of this order.

IT IS ORDERED that after Potkay files proof of the bond, defendants shall immediately restore Potkay to her position as Director of Human Resources pending further proceedings in this court.

Dated at Milwaukee, Wisconsin, this 24th day of July, 2014.

BY THE COURT

/s/ C.N. Clevert, Jr.
C.N. CLEVERT, JR.
U.S. DISTRICT JUDGE